# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## WACO DIVISION

| | |
|---|---|
| STREAMSCALE, INC., | |
| Plaintiff, | |
| v. | Civil Action No. 6:21-cv-00198-ADA |
| | **JURY TRIAL DEMANDED** |
| CLOUDERA, INC., WARGAMING (AUSTIN), INC., INTEL CORPORATION, EXPERIAN INFORMATION SOLUTIONS, INC., EXPERIAN MARKETING SOLUTIONS, LLC, EXPERIAN HEALTH, INC., AND CSIDENTITY CORP., | **ORAL ARGUMENT REQUESTED** |
| Defendants. | |

## DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF

## <u>TABLE OF CONTENTS</u>

**Page(s)**

I.    INTRODUCTION ........................................................................................................1

II.   BACKGROUND ........................................................................................................1

    A.    Error Control .................................................................................................1

    B.    Erasure Coding.............................................................................................2

    C.    Parallel Computing ......................................................................................4

    D.    The Asserted Patents....................................................................................4

III.   ARGUMENT .............................................................................................................6

    A.    "Main Memory" ...........................................................................................6

        1.    The intrinsic evidence demonstrates that main memory is volatile memory, and that main memory, registers, and cache are *different* components. ......6

        2.    The extrinsic evidence supports Defendants' proposed construction, and distinguishes between main memory, cache, and registers........................10

    B.    "Thread"/ "Threads" ..................................................................................14

        1.    The intrinsic evidence supports Defendants' proposed construction. .......14

        2.    The extrinsic evidence further supports Defendants' proposed construction..............................................................................................16

IV.   CONCLUSION.......................................................................................................17

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
  457 F.3d 1293 (Fed. Cir. 2006)....................................................................................14

*Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*,
  677 F.3d 1361 (Fed. Cir. 2012)......................................................................................8

*Comaper Corp. v. Antec, Inc.*,
  596 F.3d 1343 (Fed. Cir. 2010)......................................................................................8

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005)..............................................................................11, 15

*SIPCO, LLC v. Emerson Elec. Co.*,
  794 F. App'x 946 (Fed. Cir. 2019) .............................................................................7, 8

*Trs. of Columbia Univ. v. Symantec Corp.*,
  811 F.3d 1359 (Fed. Cir. 2016)....................................................................................15

**TABLE OF EXHIBITS**

| Ex. No. | Exhibits | Short Name |
|---|---|---|
| Ex. 1 | U.S. Patent No. 8,683,296 | 8'296 Patent |
| Ex. 2 | U.S. Patent No. 9,160,374 | '374 Patent |
| Ex. 3 | U.S. Patent No. 9,385,759 | '759 Patent |
| Ex. 4 | U.S. Patent No. 10,003,358 | '358 Patent |
| Ex. 5 | U.S. Patent No. 10,291,259 | '259 Patent |
| Ex. 6 | U.S. Patent No. 10,666,296 | 10'296 Patent |
| Ex. 7 | US2012/0272036, "Adaptive Memory System" | US2012/0272036 |
| Ex. 8 | Plank, James S, "T1: Erasure Codes for Storage Applications," Tutorial presented at the 4th USENIX Conference on File and Storage Technologies | Plank-2005 |
| Ex. 9 | Plank, James S. "A Tutorial on Reed-Solomon Coding for Fault-Tolerance in RAID-like Systems," *Software: Practice and Experience*, vol. 27, no. 9 (September 1997): 995-1012. | Plank-1997 |
| Ex. 10 | *Microsoft's Computer Dictionary*, Fifth Edition (2000) | Microsoft Comp. Dict. |
| Ex. 11 | US20040216125, "Wireless device operating system (OS) application programmer's interface (API)" | US20040216125 |
| Ex. 12 | Li, Han and Qian Huan-yan. "Parallelized Network Coding with SIMD Instruction Sets," (2008) | Li-2008 |
| Ex. 13 | 2014-01-07 Notice of Allowance | 2014-01-07 Notice of Allowance |
| Ex. 14 | *IEEE 100: The Authoritative Dictionary of IEEE Standards Terms*, 7th ed., IEEE, Institute of Electrical and Electronics Engineers Incorporated, 2000 | IEEE Dict. |

| Ex. No. | Exhibits | Short Name |
|---------|----------|------------|
| Ex. 15 | *The Wiley Electrical and Electronics Engineering Dictionary*, IEEE Press, 2004 | Wiley Dict. |
| Ex. 16 | *Understanding the Linux Kernel*, 3rd ed., O'Reilly, 2006 | O'Reilly-2006 |
| Ex. 17 | *Microsoft's Computer Dictionary*, Fifth Edition (2000) | Microsoft Comp. Dict. |

## I.    INTRODUCTION

StreamScale, Inc. ("StreamScale") asserts 117 claims directed to a well-known data storage problem—lost or corrupted data—using well-known concepts of erasure coding.  To avoid extensive prior art, StreamScale's claims were narrowly drafted to claim specific techniques for performing erasure coding.  Cloudera, Inc., Wargaming (Austin), Inc., Intel Corporation, Experian Information Solutions, Inc., Experian Marketing Solutions, LLC, Experian Health, Inc. and CSIdentity Corporation ("Defendants") seek to clarify two terms by proposing constructions that are faithful to the intrinsic evidence and sources that would be relied on by a person of ordinary skill in the art.  StreamScale argues that the terms need no construction yet fails to explain whether or how the Defendants' constructions differ from the terms' alleged plain and ordinary meanings. Defendants respectfully request that the Court construe the terms as Defendants have proposed, consistent with intrinsic and extrinsic evidence and well-settled principles of patent law.

## II.    BACKGROUND

StreamScale accuses each defendant of infringing 117 claims across six patents.  The asserted patents are U.S. Patent Nos. 8,683,296 (the "8'296 Patent"); 9,160,374 (the "'374 Patent"); 9,385,759 (the "'759 Patent"); 10,003,358 (the "'358 Patent"); 10,291,259 (the "'259 Patent"); and 10,666,296 (the "10'296 Patent") (collectively, "Asserted Patents").  The patents all share a common specification[1] and claim purportedly new methods and systems for "accelerated erasure coding" to solve the age-old problem of lost or corrupted data.

### A.    Error Control

Electronic data can be lost anytime it is transmitted or stored.  As just two examples, data

---

[1] All citations to the common specification, unless otherwise noted, cite to the 8'296 Patent specification.

can be corrupted when transmitted through a noisy channel or when a storage device fails.  Ex. 7 (US2012/0272036) ¶ 75.  To guard against this risk, computer systems often use error control techniques to improve reliability when they transmit and store data.  Ex. 1 (8'296 Patent) at 1:11-22.  Many of these techniques improve reliability by adding redundancy (i.e., copies) to the data prior to transmission or storage.  Ex. 7 (US2012/0272036) ¶ 75.  This redundancy can later be used to detect and correct errors (*i.e.*, recover the lost data).  *Id*.

A simple error control technique might replicate each unit of data *m* times, as shown below.



Ex. 8 (Plank-2005), 9.  If the original data or any of the replicas are lost during transmission or storage, the surviving copies can be used.  Ex. 8 (Plank-2005), 9.  Or, if replicas survive but do not match each other, an error may be detected.  *Id*.

**B.    Erasure Coding**

Another way a system can protect the integrity of data is through use of error correction codes ("ECC").  Error correction codes are "[a] method for encoding that allows for detection and correction of errors that occur during transmission."  Ex. 17 (Microsoft Computer Dict.) at 196-97 ("error-correcting code" and "error-correction coding").  Erasure coding is a specific type of ECC that typically works by encoding *n* units of original data (e.g., data in storage drives or communication packets) into *m* additional units of check data.



Ex. 8 (Plank-2005) at 6.  Check data is data "computed from the data [units] in such a way that the loss of any *m* [units] can be tolerated."  Ex. 9 (Plank-1997) at 997-99.  After encoding, the original *n* units of data and the *m* units of check data are distributed across *n+m* units (where each unit corresponds to, e.g., a storage device or a communication packet)—15 in the example above.  If up to *m* units are lost, the *n* surviving units can be decoded to recover the lost data (including any original data).  Ex. 1 (8'296 Patent) at 1:37-43.[2]  The *m* check blocks thus build redundancy into the system.  *Id.* at 1:32.  Further, because the value of *m* can be smaller than *n*, this approach is more space efficient than the simple replication example discussed in the prior section, in which *m* is simply a multiple of (and thus equal to or greater than) *n*.  *Id.* at 1:32-36.

According to the Asserted Patents' common specification, erasure coding is particularly useful in redundant arrays of independent (or inexpensive) disks ("RAID").  Ex. 1 (8'296 Patent) at 1:11-14.  RAID systems distribute data across multiple computer drives.  Ex. 17 (Microsoft Comp. Dict.) at 437 (RAID).  This group of drives function as a single storage unit.  Using the example above, a RAID system would have a separate drive for each *n* and *m* device, for a total of 15 drives.

---

[2] These encoding and decoding processes can be implemented using matrix operations, as is claimed in the Asserted Patents.  Those processes are not necessary to address for purposes of claim construction because "main memory" and "thread/threads" are the only disputed claim terms.

3

## C.    Parallel Computing

Traditional computer software was written for serial computation, which required a central processing unit to execute a series of instructions, one by one.  Conversely, parallel computing allows for a computer, or group of computers, to perform multiple instructions simultaneously. *See* Ex. 17 (Microsoft Comp. Dict.) at 390 (parallel processing) ("A method of processing that can run only on a computer that contains two or more processors running ***simultaneously***.") (emphasis added); *id*. at 354 (multiprocessing) ("A mode of operation in which two or more connected and roughly equal processing units each carry out one or more processes (programs or set of instructions) ***in tandem***.  In multiprocessing, each processing unit works on different sets of instructions or on different parts of the same process.") (emphasis added).  Each separate flow for each set of instructions in parallel computing is commonly referred to as a thread.  Ex. 11 (US20040216125) ¶ 113 ("A thread represents a single independent path of execution within the operating environment").  Notably, for a software program to take full advantage of a system's parallel computing capabilities, the software program often would need to parallelize its code (i.e., split into multiple flows that could be run in parallel).  *See id*.

## D.    The Asserted Patents

The Asserted Patents acknowledge that erasure codes were well-known at the time of the alleged invention and were regularly used to reconstruct lost or corrupted data.  Ex. 1 (8'296 Patent) at 1:14-51.  The Asserted Patents also acknowledge that it was known to use erasure codes on RAID systems.  *Id*. at 1:11-18; *see also id*. at 1:45-51.  Likewise, StreamScale does not claim to have invented parallel computing.  Nor could it.  *See* Ex. 12 (Li-2008) at 367 ("Since modern commodity processors are routinely multi-core processors, we further improve our accelerated implementation by increasing the level of parallelization, such that all processing cores may be fully utilized.").

4

Instead, the common specification asserts that erasure codes are "generally regarded as impractical for values of [$m$] larger than 1, . . . that is, for more than one or two check drives." Ex. 1 (8'296 Patent) at 1:52-56; *see also, id*. at 2:4-8.[3]  In other words, the specification contends that erasure codes at the time of the alleged invention could not be efficiently used with RAID systems having more than one set of check data.  The Asserted Patents purport to have solved this problem by combining two techniques—erasure coding and parallel computing—that the patents admit were prior art.  *Id*. at 2:24-51.  In fact, the Examiner made clear in the Notice of Allowance that the only purported inventive concept in the Asserted Patents was the very particular combination of prior art techniques claimed in the Asserted Patents.  Ex. 13 (2014-01-07 Notice of Allowance) at 5 (stating that the inventive component was "a thread for executing on the processing core and comprising: a parallel multiplier for concurrently multiplying multiple data entries of a matrix by a single factor; and a first sequencer for ordering operations through the data matrix and the encoding matrix using the parallel multiplier to generate the check data").

For purposes of claim construction, claim 1 of the 8'296 Patent is representative:

> 1.  A system for accelerated error-correcting code (ECC) processing comprising:
>
> > a processing core for executing computer instructions and accessing data from a **main memory**; and
> >
> > a non-volatile storage medium for storing the computer instructions,
> >
> > wherein the processing core, the non-volatile storage medium, and the computer instructions are configured to implement an erasure coding system comprising:
> >
> > > a data matrix for holding original data in the **main memory**;

---

[3] Defendants disagree with this premise as it is clear from the prior art, including the prior art cited in the Asserted Patents, that systems in use as of the asserted patents' priority date could efficiently utilize more than one check drive.

a check matrix for holding check data in the **main memory**;

an encoding matrix for holding first factors in the **main memory**, the first factors being for encoding the original data into the check data; and

a **thread** for executing on the processing core and comprising:

a parallel multiplier for concurrently multiplying multiple data entries of a matrix by a single factor; and

a first sequencer for ordering operations through the data matrix and the encoding matrix using the parallel multiplier to generate the check data.

(Emphases added).

## III.    ARGUMENT

### A.    "Main Memory"

| Defendants' proposed construction | StreamScale's proposed construction |
|---|---|
| "part of volatile internal storage into which instructions and other data must be loaded for subsequent execution or processing (e.g., RAM), not including registers or cache" | Plain and ordinary meaning |

The parties dispute whether "main memory" should be given a meaning that—in accordance with the claims, specification, and extrinsic evidence—helps distinguish it from other memory types (as Defendants' construction does), or whether it should be given an unspecified "plain and ordinary" meaning that could be interpreted in ways that alter the scope of the claims.

### 1.    The intrinsic evidence demonstrates that main memory is volatile memory, and that main memory, registers, and cache are *different* components.

The intrinsic evidence demonstrates that the Asserted Patents use "main memory" consistent with its widely accepted meaning as a memory type distinct from other memory types,

such as non-volatile memory, registers or cache.[4]

**First,** the specification and claims repeatedly distinguish "main memory" and "non-volatile storage medium," referring to each separately. *SIPCO, LLC v. Emerson Elec. Co.*, 794 F. App'x 946, 949 (Fed. Cir. 2019) ("Because the patentee chose to use different terms to define the 'receiver address' and the 'scalable address,' we presume that those two terms have different meanings."). For example, claim 1 of the 8'296 Patent recites a "main memory" and separately recites a "non-volatile storage medium." Ex. 1 (8'296 Patent) at claim 1 ("A system for accelerated error-correcting code (ECC) processing comprising:  a processing core for executing computer instructions and accessing data from a ***main memory***; and a ***non-volatile storage medium*** for storing the computer instructions. …" (emphases added)). Similarly, the common specification consistently differentiates between "main memory" and "non-volatile storage." For instance, the Abstract and Summary of the common specification refer to each component separately. *See* Ex. 1 (8'296 Patent) at Abstract ("An accelerated erasure coding system includes a processing core for executing computer instructions and accessing data from a main memory, and a non-volatile storage medium for storing computer instructions."); *id*. at 3:43-47 ("The system includes a processing core for executing computer instructions and accessing data from a main memory; and a non-volatile storage medium (for example, a disk drive, or flash memory) for storing the computer instructions."); *see also id*. at 23:11-15 ("***Main memory*** 140, in turn, is shared between the two dies 110, and ***is connected to*** the input/output (I/O) controllers 150 that access external

---

[4] The widely accepted meaning of "main memory" is "the part of internal storage into which instructions and other data must be loaded for subsequent execution or processing," as defined by IEEE's Authoritative Dictionary of IEEE Standard Terms. Ex. 14 (IEEE Dict.) at 659. *See infra* Section III.A.2. Further, technical dictionaries at the time of the alleged invention consistently define main memory as random-access memory, which is a form of volatile memory. *See id*. These dictionaries also show that "main memory" is a distinct memory component from "cache" and "registers." *See id*.

devices such *disk drives or other non-volatile storage devices*[.]") (emphases added).

      *Second*, the claims also demonstrate that "main memory" is distinct from the claimed "register" by referring to each separately. *Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*, 677 F.3d 1361, 1369 (Fed. Cir. 2012) (finding that "[n]othing in the Patent suggests that 'storing' and 'applying' are used interchangeably," and therefore, "[t]he general presumption that different terms have different meaning remains"); *see also SIPCO, LLC*, 794 F. App'x at 949; *Comaper Corp. v. Antec, Inc.*, 596 F.3d 1343, 1348 (Fed. Cir. 2010) ("two different terms used in a patent have different meanings"). For instance, in the 8'296 Patent, claim 1 expressly refers to "a processing core for executing computer instructions and accessing data from a *main memory*." Ex. 1 (8'296 Patent) at claim 1 (emphasis added). But claim 19 of the 8'296 Patent, which depends from claim 1, discloses that the "processing core comprises 16 data *registers*." Ex. 1 (8'296 Patent) at claim 19 (emphasis added). Similarly, claim 1 of the '374 patent includes limitations in which "main memory" is separate and distinct from "registers." This claim requires that the processing core *comprises registers* and separately that the processing core accesses data *from main memory*, indicating that these components must be distinct. Ex. 2 ('374 Patent) at claim 1 ("a processing core for executing computer instructions and accessing data from a main memory, the processing core comprising at least 16 data registers, each of the data registers comprising at least 16 bytes"). Multiple additional claims of the patents further indicate that "main memory" and "register" are distinct components. *See* Ex. 2 ('374 Patent) at claims 7, 13 (claiming both "main memory" and "registers"); Ex. 3 ('759 Patent) at claims 1, 8, 15 (same); Ex. 4 ('358 Patent) at claims 1, 12, 14, 20, 22, 31, 33, 39, 41, 50, 52 (claiming both "main memory" and "vector register"); Ex. 6 (10'296 Patent) at claims 1, 5 (claiming both "main memory" and "registers"); Ex. 5 ('259 Patent) at claims 1, 12, 20, 31, 39, 50 (claiming both "main memory" and "vector register").

**Third**, the common specification consistently and deliberately draws distinctions between "main memory," "registers," and "cache." For example, the specification explains that data is fetched from main memory and preserved in registers. Ex. 1 (8'296 Patent) at 18:58-65 (explaining that data can be preserved in "registers" "without having to access main memory to reload the data"); *id*. at 21:36-46 (disclosing that "computations involving the first surviving data drives 64 bytes of data, which were fetched with one access from **main memory** and preserved in the same four **registers** [holding other data fetched from main memory]") (emphasis added); *id*. at 21:60-22:3 (explaining that "computations involving the next surviving data drives 64 bytes of data, which were fetched with one access from **main memory** and preserved in the same four **registers** [holding other data fetched from main memory]") (emphases added). As yet another example, the specification explains that each processing core has a "cache" and a separate "main memory" component. *Id*. at 23:1-15 ("Referring to FIG. 8, each die 110 includes four central processing units (CPUs or cores) 120 each having a local level 1 (L1) **cache**. ... Each die 110 also has a level 2 (L2) **cache**/memory bus interface 130 shared between the four cores 120. **Main memory** 140, in turn, is shared between the two dies 110, and is connected to the input/output (I/O) controllers 150 that access external devices such as disk drives or other non-volatile storage devices via interfaces such as Peripheral Component Interconnect (PCI).").

**Fourth**, the figures of the Asserted Patents further require that cache, register, and main memory be separate components. For example, Figure 8 which represents the multi-core system of the alleged invention, explains that 140 is "main memory" (highlighted in red), whereas 120 and 130 contain caches (highlighted in blue):

9



Likewise, Figure 3 shows a method of the alleged invention and describes main memory and registers as distinct components. Specifically, in step 420 (blue) of Figure 3, data is loaded from main memory in to four registers. Ex. 1 (8'296 Patent) at 18:11-19, Fig. 3.



Thus, the specification repeatedly and consistently refers to each of these different devices as *different* components of computer architecture.

### 2. The extrinsic evidence supports Defendants' proposed construction, and distinguishes between main memory, cache, and registers.

Technical dictionaries at the time of the alleged invention further confirm that a person of ordinary skill in the art would have understood that "main memory" is "part of volatile internal

storage into which instructions and other data must be loaded for subsequent execution or processing (e.g., RAM), not including registers or cache," i.e., that main memory is distinct from non-volatile memory, cache, and registers. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005) ("[T]echnical dictionaries may [be] provide[d] to a court 'to better understand the underlying technology' and the way in which one of skill in the art might use the claim terms.").

*First*, multiple technical dictionaries make clear that "main memory" is internal storage and equivalent to "RAM" (random access memory), which is a form of volatile memory:

*IEEE 100: The Authoritative Dictionary of IEEE Standards Terms*:

> **main memory** *See:* main storage.
>
> **main storage** That part of internal storage into which instructions and other data must be loaded for subsequent execution or processing. *Synonyms:* primary storage; main memory. *Contrast:* auxiliary storage. *See also:* real storage; common storage; random-access memory.        (C) 610.10-1994w

Ex. 14 (IEEE Dict.) at 659.

*The Wiley Electrical and Electronics Engineering Dictionary*:

> **main memory** Better known as **RAM**. One or more memory chips that can be read and written by the CPU and other hardware, and which serve as the primary workspace of a computer. Instructions and data are loaded here for subsequent execution or processing, and its storage locations may be accessed in any desired order. The amount of main memory a computer has determines factors such as how many programs may be optimally run simultaneously. Also called **main storage, random-access memory, read/write memory, read/write RAM, primary memory, primary storage,** or **core memory (2)**.

Ex. 15 (Wiley Dict.) at 451.

11

*Microsoft's Computer Dictionary*:

> **main memory** *n. See* primary storage.

> **primary storage** *n.* Random access memory (RAM); the main general-purpose storage region to which the micro-processor has direct access. A computer's other storage options, such as disks and tape, are called *secondary storage* or (sometimes) *backing storage*.

Ex. 10 (Microsoft Comp. Dict.) at 326, 419 (main memory; primary storage). These technical dictionaries thus demonstrate that "main memory" had a well understood meaning to a person of ordinary skill in the art at the time of the alleged invention that aligns with Defendants' proposed claim construction.

**Second**, these same sources demonstrate that a person of ordinary skill in the art at the time of the invention would have understood that "cache" was not encompassed by the term "main memory." For example, *The Authoritative Dictionary of IEEE Standards Terms* draws a clear distinction between "cache" and "main memory":

> **cache memory** **(1)** A buffer memory inserted between one or more processors and the bus, which is used to hold currently active copies of blocks of information from main memory.
> (C/BA) 1014.1-1994w
> **(2)** A buffer memory inserted between one or more processors and the bus, used to hold currently active copies of blocks from main memory. Cache memories exploit spatial locality by what is brought into a cache. Temporal locality is exploited by the strategy employed for determining what is removed from the cache. (C/BA) 10857-1994, 896.4-1993w

Ex. 14 (IEEE Dict.) at 135 (cache). Similarly, *The Microsoft Computer Dictionary* draws this same distinction between "cache" and "main memory," which the dictionary defines as "RAM":

12

> **cache** *n.* A special memory subsystem in which fre-
> quently used data values are duplicated for quick access.
> A memory cache stores the contents of frequently
> accessed RAM locations and the addresses where these
> data items are stored. When the processor references an
> address in memory, the cache checks to see whether it
> holds that address. If it does hold the address, the data is
> returned to the processor; if it does not, a regular memory
> access occurs. ==A cache is useful when RAM accesses are
> slow compared with the microprocessor speed because
> cache memory is always faster than main RAM memory.==
> *See also* disk cache. wait state.

Ex. 10 (Microsoft Comp. Dict.) at 81 (cache); *id.* at 326 (defining "main memory" as "primary

storage"), *id.* at 419 (defining "primary storage" as "RAM").

     ***Third***¸ these same sources make clear that a register is also a distinct component from main

memory.  Specifically, they indicate that registers are high-speed memory located ***within*** the

microprocessor, as opposed to being part of the computer's main memory.  For example, *The*

*Microsoft Computer Dictionary* defines "register" as:

> **register** *n.* ==A set of bits of high-speed memory within a
> microprocessor or other electronic device, used to hold
> data for a particular purpose.== Each register in a central
> processing unit is referred to in assembly language pro-
> grams by a name such as *AX* (the register that contains the
> results of arithmetic operations in an Intel 80x86 proces-
> sor) or *SP* (the register that contains the memory address
> of the top of the stack in various processors).

Ex. 10 (Microsoft Comp. Dict.) at 445 (register).  And *Wiley Electrical and Electronics*

*Engineering Dictionary* defines "register" as:

> **register  1.** ==A high-speed storage area within the CPU,== which
> is utilized to hold data for specific purposes.  Before data
> may be processed, it must be represented in a register.
> There are various types, including control registers, index
> registers, arithmetic registers, and shift registers.  Also
> called **data register,** or **storage register (1). 2.** A device

Ex. 15 (Wiley Dict.) at 648 (register); *see also*, Ex. 14 (IEEE Dict.) at 949 (register) ("[a] device

capable of retaining information, often that contained in a small subset (for example, one word), of the aggregate information in a digital computer.").

As each of the above technical dictionaries confirms, "main memory" is internal, volatile storage that is distinct from each of "cache" and "register,"—a distinction that StreamScale seemingly seeks to ignore by pursuing a "plain and ordinary meaning" construction.

### B.    "Thread"/ "Threads"

| Defendants' proposed construction | StreamScale's proposed construction |
|---|---|
| "A single flow of control within a process"/ "Flows of control within a process" | Plain and ordinary meaning |

The parties dispute whether the terms "thread" and "threads" should be construed in accordance with the claims, specification, and extrinsic evidence—as "a flow of control within a process" (as Defendants propose)—or whether they should be given an ambiguous "plain and ordinary" meaning.

### 1.    The intrinsic evidence supports Defendants' proposed construction.

The intrinsic evidence illustrates that the patents use "thread" consistent with how a person of ordinary skill in the art at the time of the alleged invention would have understood the term—that is "a single flow of control within a process."[5]

***First***, the claims of the Asserted Patents recite operations that are consistent with Defendants' proposed construction requiring that a "thread" is a single flow of control within a process. *See Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 457 F.3d 1293, 1301 (Fed. Cir. 2006) ("[C]laim construction must begin with the words of the claims themselves."). In particular, the claims require that each thread is assigned a particular function or task within a process or system.

---

[5] IEEE defines "thread" exactly as Defendants propose: "A single flow of control within a process." Ex. 14 (IEEE Dict.) at 1176 (thread). Indeed, both technical dictionaries and relevant prior art define "thread" consistent with Defendants' construction. *See infra* Section III.B.2.

For example, claim 3 of the 8'296 Patent requires "assigning corresponding ones of the data matrices and the check matrices to the threads." Ex. 1 (8'296 Patent) at claim 3; *see also id*. at claim 13; Ex. 6 (10'296 Patent) at claim 1; *see also id*. at claim 5. In other words, the claims assign a single subtask, such as the data or check matrix, to a single thread for the processor to handle. *See also* Ex. 4 ('358 Patent) at claim 2 ("assigning the data operations to the first thread group, and not assigning the I/O operations to the first thread group.").

    ***Second***, when describing a thread's function, the specification explains how a thread is a single flow of control within a process. *See Trs. of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1364 (Fed. Cir. 2016) ("[T]he specification may define claim terms by implication such that the meaning may be found in or ascertained by a reading of the patent documents."); *Phillips*, 415 F.3d at 1315 ("[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'") (citation omitted). Specifically, the common specification explains that "software may be organized into threads, and threads may be assigned to specific CPUs and memory systems." Ex. 1 (8'296 Patent) at 24:5-13. The threads, according to the common specification, are used for parallel computation. In particular, the system "subdivid[es] and assign[s] individual cores" to "parallelizable tasks." *Id*. Using threads for parallel computation in this manner "result[s] in a performance benefit." *Id*. The specification further discloses that each thread is responsible for one command—in other words, a single flow of control. The specification states that "creating multiple threads for command processing allows for fully overlapped execution of the command processing states." Ex. 1 (8'296 Patent) at 24:14-16. This is achieved by "number[ing] each command" and then "***choos[ing] a separate thread for each command***." *Id*. at 24:16-18 (emphasis added). *See also id*. at 24:19-21 ("Another technique is to subdivide the data processing portion of each command

into multiple components, and assign each component to a separate thread.").

The specification thus discloses that each thread is responsible for a single flow of control ("a separate thread for each command," "assign[ing] each component to a separate thread") and that the threads are within a process or system to achieve parallel computation.

> ### 2.    The extrinsic evidence further supports Defendants' proposed construction.

As demonstrated by the extrinsic evidence, the understanding of the term "thread" by a person of ordinary skill in the art at the time of the alleged invention was "a single flow of control within a process," with the logical plural of the term being "flows of control within a process."

***First***, technical dictionaries from the time of the invention support Defendants' claim construction. For example, the Institute of Electrical and Electronics Engineers (IEEE) defines a thread exactly as Defendants propose:

> (4) A single flow of control within a process. Each thread has its own thread ID, scheduling priority and policy, *errno* value, thread-specific key/value bindings, and the required system resources to support a flow of control. Anything whose address may be determined by a thread, including but not limited to static variables, storage obtained via *malloc*(), directly addressable storage obtained through implementation-supplied functions, and automatic variables shall be accessible to all threads in the same process.    (C/PA) 9945-1-1996

Ex. 14 (IEEE Dict.) at 1176 (thread). *The Microsoft Computer Dictionary* similarly defines "thread" as:

> **thread** *n.* **1.** In programming, a process that is part of a larger process or program. **2.** In a tree data structure, a pointer that identifies the parent node and is used to facilitate traversal of the tree. **3.** In electronic mail and Internet newsgroups, a series of messages and replies related to a specific topic.

Ex. 10 (Microsoft Comp. Dict.) at 518 (thread).

***Second***, relevant prior art defines "thread" consistent with Defendants' proposed definition.  The common specification specifically contemplates that the alleged invention be used in a Linux system.  *See* Ex. 1 (8'296 Patent) at 24:5-13 ("[O]n a Linux system, software may be organized into 'threads,' and 'threads' may be assigned to specific CPUs and memory systems.").  And importantly, a computer textbook regarding the Linux kernel defines "thread" as Defendants propose.  Specifically, the textbook explains that in computer systems, "a process is composed of several *user threads* (or simply *threads*), each of which represents an execution flow of the process."  Ex. 16 (O'Reilly-2006) at 80.

## IV.    CONCLUSION

Defendants respectfully request that the Court construe the terms as Defendants propose—consistent with intrinsic evidence, extrinsic evidence, and well-settled principles of patent law.

17

Dated: January 18, 2022                    Respectfully submitted,


*/s/ Brian C. Nash*
Brian C. Nash
Texas State Bar No. 24051103
Austin M. Schnell
Texas State Bar No. 24095985
PILLSBURY WINTHROP SHAW PITTMAN LLP
401 Congress Avenue, Suite 1700
Austin, TX  78701-3797
Tel: (512) 580-9629
Email: brian.nash@pillsburylaw.com
Email: austin.schnell@pillsburylaw.com

Sonal N. Mehta (*Pro Hac Vice*)
   California State Bar No. 222086
Jennifer J. John (*Pro Hac Vice*)
   California State Bar No. 331716
   Massachusetts State Bar No. 694749
WILMER CUTLER PICKERING HALE
& DORR LLP
2600 El Camino Real
Suite 400
Palo Alto, CA 94306
Tel: (650) 858-6000
Email: Sonal.Mehta@wilmerhale.com
Email: Jennifer.John@wilmerhale.com

Amanda L. Major (*Pro Hac Vice*)
   DC Bar No. 495968
   New York Bar No. 4304507
WILMER CUTLER PICKERING HALE
& DORR LLP
1875 Pennsylvania Avenue
Washington, DC 20006
Tel: (202) 663-6000
Email: Amanda.Major@wilmerhale.com

Joseph T. Gooch (*Pro Hac Vice*)
   California State Bar No. 294282
WILMER CUTLER PICKERING HALE
& DORR LLP
One Front Street, Suite 3500
San Francisco, CA 94111
Tel: (628) 235-1002
Email: Taylor.Gooch@wilmerhale.com

Vikram P. Iver (*Pro Hac Vice*)

18

California State Bar No. 318324
WILMER CUTLER PICKERING HALE
& DORR LLP
350 South Grand Avenue, Suite 2400
Los Angeles, California 90071
Tel: (213) 443-5300
Email: Vikram.Iyer@wilmerhale.com

Annaleigh E. Curtis (*Pro Hac Vice*)
    Massachusetts State Bar No. 696165
WILMER CUTLER PICKERING HALE
& DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6000
Email: Annaleigh.Curtis@wilmerhale.com

*Attorneys for Intel Corporation*

*/s/ Brock S. Weber*
Steven P. Tepera
Texas Bar No. 24053510
PILLSBURY WINTHROP SHAW PITTMAN LLP
401 Congress Avenue, Suite 1700
Austin, TX 78701-3797
Telephone: 512.580.9600
Facsimile: 512.580.9601
Email: steven.tepera@pillsburylaw.com


Christopher Kao (*pro hac vice*)
christopher.kao@pillsburylaw.com
Brock S. Weber (*pro hac vice*)
brock.weber@pillsburylaw.com
PILLSBURY WINTHROP SHAW PITTMAN LLP
4 Embarcadero Center, 22nd Floor
San Francisco, CA 94111
Telephone: 415.983.1000
Facsimile: 415.983.1200

*Attorneys for Defendants Cloudera, Inc.,*
*Experian Information Solutions, Inc.,*
*Experian Marketing Solutions, LLC,*
*Experian Health, Inc., and CSIdentity Corp.*


*/s/ Christopher S. Ponder*
Jennifer Klein Ayers (TX Bar No. 24069322)
jayers@sheppardmullin.com

19

SHEPPARD MULLIN RICHTER &
HAMPTON
2200 Ross Avenue, 20th Floor
Dallas, TX 75201
Tel: 469-391-7414
Fax: 469-391-7558

Harper Batts (CA Bar No. 242603)
(*Pro Hac Vice*)
hbatts@sheppardmullin.com
Chris Ponder (TX Bar No. 24065916)
(*Pro Hac Vice*)
cponder@sheppardmullin.com
SHEPPARD MULLIN RICHTER &
HAMPTON
379 Lytton Avenue
Palo Alto, CA 94301
Tel: 650-815-2676
Fax: 650-815-4664

*Attorneys for Defendant*
*Wargaming (Austin), Inc.*

20

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on all counsel of record via the Court's ECF system on January 18, 2022.


                                                    */s/ Brian C. Nash*
                                                    Brian C. Nash