**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | |
|---|---|
| STREAMSCALE, INC., | Civil Action No. 6:21-cv-00198 ADA |
| Plaintiff, | |
| v. | |
| CLOUDERA, INC., AUTOMATIC DATA PROCESSING, INC., EXPERIAN PLC, WARGAMING (AUSTIN), INC., and INTEL CORPORATION, | |
| Defendants. | |

## CLOUDERA, INC.'S MOTION FOR SUMMARY JUDGMENT OF INVALIDITY

# REDACTED PUBLIC VERSION

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ........................................................................................... 1

II.  BACKGROUND ............................................................................................ 2

    A.   Erasure Coding Uses Math To Encode/Decode Data For Fault Tolerance. ........... 2

    B.   The Patents-in-Suit Recite Performing Erasure Coding In Parallel Using Conventional Computer Processors. ........................................................................ 4

    C.   The Asserted Claims. .............................................................................. 7

III. LEGAL STANDARDS ................................................................................ 10

    A.   Summary Judgment. ............................................................................... 10

    B.   Patent Ineligibility Under 35 U.S.C. § 101. ............................................ 10

IV.  ARGUMENT ................................................................................................ 11

    A.   *Alice* Step One: StreamScale's Patent Claims Are Directed To The Abstract Idea Of Using Math To Encode / Decode Data. ...................................... 11

    B.   *Alice* Step Two: The Asserted Claims Lack an Inventive Concept. ..................... 15

V.   CONCLUSION .............................................................................................. 20

4893-1283-3394

# TABLE OF AUTHORITIES

**Page(s)**

Cases

*Affinity Labs of Texas, LLC v. Amazon.com Inc.*,
    838 F.3d 1266 (Fed. Cir. 2016)..................................................................................................15

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
    573 U.S. 208 (2014)....................................................................................................... *passim*

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)....................................................................................................................10

*Appishy, Inc. v. Amazon.com Inc.*,
    26 No. C15-311 MJP, 2015 WL 4210890 (W.D. Wash. July 9, 2015), *aff'd sub nom.*
    *Appistry, LLC v. Amazon.com, Inc.*, 676 F. App'x 1007 (Fed. Cir. 2017)...............................13

*Athena Diagnostics, Inc. v. Mayo Collaborative Servs., LLC*,
    915 F.3d 743 (Fed. Cir. 2019)....................................................................................................12

*Bascom Global Internet Servs., Inc. v. AT&T Mobility LLC*,
    827 F.3d 1341 (Fed. Cir. 2016)..................................................................................................20

*In re Bd. of Trustees of Leland Stanford Junior Univ.*,
    991 F.3d 1245 (Fed. Cir. 2021)......................................................................................13, 18, 20

*Berkheimer v. HP, Inc.*,
    881 F.3d 1360 (Fed. Cir. 2018)..................................................................................................10

*Broadband iTV, Inc. v. Amazon.com, Inc.*,
    No. 6:20-CV-00921-ADA, 2022 WL 4703425 (W.D. Tex. Sept. 30, 2022) (Albright, J.).....11

*BSG Tech LLC v. Buyseasons, Inc.*,
    899 F.3d 1281 (Fed. Cir. 2018)..................................................................................... *passim*

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)....................................................................................................................10

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*,
    776 F.3d 1343 (Fed. Cir. 2014).....................................................................................................7

*Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*,
    758 F.3d 1344 (Fed. Cir. 2014)..................................................................................................14

*Elec. Power Grp., LLC v. Alstom S.A.*,
    830 F.3d 1350 (Fed. Cir. 2016)..................................................................................... *passim*

4893-1283-3394

*Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*,
    955 F.3d 1317 (Fed. Cir. 2020)...............................................................................11

*Health Discovery Corp. v. Intel Corp.*,
    577 F. Supp. 3d 570 (W.D. Tex. 2021) (Albright, J.)...............................................11

*Intellectual Ventures I LLC v. Symantec Corp.*,
    838 F.3d 1307 (Fed Cir. 2016)...............................................................................12

*Internet Patents Corp. v. Active Network, Inc.*,
    790 F.3d 1343 (Fed. Cir. 2015)...............................................................................15

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
    566 U.S. 66 (2012).............................................................................1, 2, 10, 15

*Parker v. Flook*,
    437 U.S. 584 (1978)...............................................................................................14

*RecogniCorp, LLC v. Nintendo Co., Ltd.*,
    855 F.3d 1322 (April 28, 2017) ................................................................11, 15, 17

*SAP Am., Inc. v. InvestPic, LLC*,
    898 F.3d 1161 (Fed. Cir. 2018)..................................................................... *passim*

*In re Schrader*,
    22 F.3d 290 (Fed. Cir. 1994)..................................................................................14

*Swarm Tech LLC v. Amazon.com Inc.*,
    No. CV-21-00438-PHX-DJH, 2021 WL4263728 (D. Ariz. Sept. 20, 2021) ..........13

*Teradata US, Inc. v. SAP SE*,
    No. 20-cv-06127-WHO, 27 2021 WL 6332792 (N.D. Cal. Oct. 5, 2021) ..............13

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
    874 F.3d 1329 (Fed. Cir. 2017)...............................................................................15

*Uniloc 2017 LLC v. Netflix, Inc.*,
    No. 18-2055-GW, 2019 WL 3291581 (C.D. Cal. May 14, 2019)...........................13

*USC IP P'ship, L.P. v. Facebook, Inc.*,
    576 F. Supp. 3d 446 (W.D. Tex. 2021) (Albright, J.)..............................................17

<u>Statutes and Codes</u>

United States Code
    Title 35 Section 101 .............................................................................2, 10, 14, 20

<u>Rules and Regulations</u>

Federal Rule of Civil Procedure
    Rule 56 ........................................................................................................................1
    Rule 56(a) ..................................................................................................................10

<u>Other Authorities</u>

Reed, I.S., and Solomon, G., Polynomial Code Over Certain Finite Fields, J. Soc. Indust. Appl.
    Math, Vol. 8, No. 2, June 1960 .................................................................................3

United States Patent
    No. 8 ............................................................................................................................1
    No. 9 ............................................................................................................................1
    No. 10 ..........................................................................................................................1
    No. 160 ........................................................................................................................1
    No. 259 ........................................................................................................................1
    No. 291 ........................................................................................................................1
    No. 296 ........................................................................................................................1
    No. 374 ........................................................................................................................1
    No. 385 ........................................................................................................................1
    No. 666 ........................................................................................................................1
    No. 683 ........................................................................................................................1
    No. 759 ........................................................................................................................1

Pursuant to Federal Rule of Civil Procedure 56, Defendant Cloudera, Inc. ("Cloudera") moves for summary judgment of invalidity.

## I.    INTRODUCTION

The Asserted Claims of the Patents-in-Suit[1] are unpatentable as a matter of law. They are all directed to the abstract idea of encoding and decoding data using math, something that humans have been doing since ancient times.  Specifically, the Patents-in-Suit claim the basic idea of using math to encode a set of data (the "original" data) stored on a hard disk drive or other storage device into a different set of data (the "check", or "parity" data) that can be used to restore any original data that is lost—or "erased"—as a result of a hard disk failure, for instance. This concept is called "erasure coding," and has been used for decades prior to the filing of the Patents-in-Suit. The Patents-in-Suit, however, purport to "accelerate" the performance of this math, in this case matrix-based <u>addition</u> and <u>multiplication</u>, by utilizing conventional computer processors to perform the calculations in parallel, and thus more quickly than they could have been performed before. This is precisely the kind of "invention" that the Supreme Court has held to be unpatentable in *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208 (2014). Simply using conventional computer hardware (specifically, modern computer processors released in the late 1990s) to perform matrix addition and multiplication faster than can be done by pen and paper, or using a 1960s-era computer, is <u>not</u> a patentable invention.

It is well-settled that "mathematical formulas" and algorithms are unpatentable abstract ideas. *See Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 89 (2012). As the

---

[1] Plaintiff asserts U.S. Patent Nos. 8,683,296 ("the 8'296 Patent"), 9,160,374 ("the '374 Patent"), 9,385,759 ("the '759 Patent"), 10,291,259 ("the '259 Patent"), and 10,666,296 ("the 10'296 Patent") (collectively, the "Patents-in-Suit").  Plaintiff asserts Claims 1–4, 34–36 of the 8'296 Patent, Claims 1, 5–6 of the '374 Patent, Claims 1, 5–7 of the '759 Patent, Claims 12–16, 19 of the '259 Patent, and Claims 1-4, 5-8 of the 10'296 Patent (collectively, the "Asserted Claims").

4893-1283-3394

Supreme Court has made clear, "stat[ing] the law of nature while adding the words 'apply it'" does not transform unpatentable subject matter into patentable subject matter. *Id.* at 72; *see Alice*, 573 U.S. at 222 ("[s]imply appending conventional steps, specified at a high level of generality" to an abstract idea is not enough to provide the inventive step) (quoting *Mayo,* 566 U.S. at 82). And doing it "on… a computer" is no different. *Alice*, 573 U.S. at 223 (quoting *Mayo,* 566 U.S. at 84). The asserted claims are therefore invalid under 35 U.S.C. § 101 as a matter of law.

## II.    BACKGROUND

### A.    Erasure Coding Uses Math To Encode/Decode Data For Fault Tolerance.

As a general matter, when storing electronic data, backups are needed to ensure that data is not lost if a storage device fails. One way to store backup data is to simply make full copies of the original data and store those copies on different storage devices (typically across many, many different storage devices) so that if a particular storage device fails for whatever reason (corruption of the hard disk, loss of power, a fire, etc.), another copy of the data on that device is available elsewhere. This concept is called replication. An alternative to replication is a concept known as "erasure coding." In erasure coding, rather than making a full copy of the original data, mathematical operations are performed on the original data to create a smaller set of data (called "check" or "parity" data) that can be used to restore any part of the original data that is subsequently lost. *See* Ex. 1 [Expert Report of Darrell Long, February 27, 2023], ¶¶49-50; Ex. 2 [8'296 Patent] at 2:1-3, 3:8-20. In the event of a data loss, the surviving original data and check data can be decoded to reconstruct the lost data.  *See* Ex. 1 [Long Rep.], ¶¶49-50; Ex. 2 [8'296 Patent] at 1:14-51.

The concept of erasure coding was well-known prior to the Patents-in-Suit. Ex. 2 [8'296 Patent] at 1:14-51 (disclosing that it was known in the "related art" that erasure codes encode

2

additional blocks "called check blocks or check data[] from the original [] data blocks" and the related decoding or "reconstruc[ion]" process); Ex. 3 [Deposition of Michael Anderson, September 6, 2022] at 105:20-22. ███████████████████████████████████████████████

███████. Erasure coding in particular makes use of what are known as "Reed-Solomon" codes, which were originally developed by Irving S. Reed and Gustave Solomon at MIT and first published in 1960. Ex. 4 [Reed, I.S., and Solomon, G., Polynomial Code Over Certain Finite Fields, J. Soc. Indust. Appl. Math, Vol. 8, No. 2, June 1960]; *see also* Ex. 5 [Rebuttal Expert Report of Kannan Ramchandran, dated March 24, 2023] at ¶¶62-63; Ex. 1 [Long Rep.] at ¶51.

Reed-Solomon codes use matrix math (specifically, Galois-field or "GF" math) to encode original data to check data. ██████████████████████████████████████

██████████████████████████████████



This same process is shown in the Asserted Patents, using D to represent the original data, J to represent the check data, and H to represent the encoding matrix using Reed-Solomon codes. *See* Ex. 2 [8'296 Patent] at 11:6-12:67, 12:8-18 (annotated below).

3

$$\begin{bmatrix} J_{11} & J_{12} & \dots & J_{1L} \\ J_{21} & J_{22} & \dots & J_{2L} \\ \vdots & \vdots & \ddots & \vdots \\ J_{M1} & J_{M2} & \dots & J_{ML} \end{bmatrix} = \begin{bmatrix} H_{11} & H_{12} & \dots & H_{1N} \\ H_{21} & H_{22} & \dots & H_{2N} \\ \vdots & \vdots & \ddots & \vdots \\ H_{M1} & H_{M2} & \dots & H_{MN} \end{bmatrix} \times \begin{bmatrix} D_{11} & D_{12} & \dots & D_{1L} \\ D_{21} & D_{22} & \dots & D_{2L} \\ \vdots & \vdots & \ddots & \vdots \\ D_{N1} & D_{N2} & \dots & D_{NL} \end{bmatrix},$$

Check Data     Encoding Matrix     Original Data

The Galois-field math involved in creating the check data utilizes a series of addition and multiplication operations (*see* Ex. 1 [Long Report] at ¶55), as shown in the Asserted Patents:

where $J_{11}=(H_{11} \times D_{11})+(H_{12} \times D_{21})+ \ . \ . \ . \ +(H_{1N} \times D_{N1})$, $J_{12}=(H_{11} \times D_{12})+(H_{12} \times D_{22})+ \ . \ . \ . \ +(H_{1N} \times D_{N2})$, $J_{21}=(H_{21} \times D_{11})+(H_{22} \times D_{21})+ \ . \ . \ . \ +(H_{2N} \times D_{N1})$, and in general, $J_{ij}=(H_{i1} \times D_{1j})+(H_{i2} \times D_{2j})+ \ . \ . \ . \ +(H_{1N} \times D_{Nj})$ for $1 \leq i \leq M$ and $1 \leq j \leq L$.

Ex. 2 [8'296 Pat.] at 12:21-24.

The decoding or reconstruction process reverses the encoding math. *See* Ex. 1 [Long Rep.] at ¶56. The inverted matrix of the encoding matrix (called a "solution matrix") is multiplied by the surviving data matrix including the check data to generate the original data. *Id.*

All of this math was well-known before the Patents-in-Suit. Ex. 6 [Deposition of Michael Anderson, December 5, 2022] at 454:3-5 ███████████████████████████████ ████████████████████████████████. Indeed, Galois-field math was first described by French mathematician Évariste Galois in the early 1800s, and can be performed mentally and by using a pen and paper. *See* Ex. 1 [Long Rep.] at ¶¶58-59.

**B.**    **The Patents-in-Suit Recite Performing Erasure Coding In Parallel Using Conventional Computer Processors.**

According to the Patents-in-Suit, erasure coding had traditionally been a very slow process due to the extensive mathematical computations required to perform Galois-field multiplication

4

with large amounts of data. To solve this alleged problem, the Patents-in-Suit claim to describe a system for "accelerated" erasure coding that uses a "parallel multiplier" to perform the Galois-field arithmetic in parallel (including by multiple processing cores) and a "sequencer" to order the calculations that need to be performed.

All the Patents-in-Suit disclose, however, is using the conventional (Intel) x86 computer processors that were available at the time for their intended purpose, executing computer instructions. Indeed, the Patents-in-Suit emphasize that the claimed invention is "lower cost" than other solutions "due to the use of high volume **commodity components** that are leveraged to achieve the result." Ex. 2 [8'296 Pat.] at 23:63-65 (emphasis added). Specifically, the Patents-in-Suit disclose using Intel's "SIMD" instruction set for its processors to perform the necessary Galois-field arithmetic needed for erasure coding. The patent specification states that Galois-field addition can be performed "in parallel by using, for instance, x86 architecture Streaming SIMD Extensions (SSE) instructions (SIMD stands for single instruction, multiple data, and refers to performing the same instruction on different pieces of data, possibly concurrently), such as [the] PXOR (Packed (bitwise) Exclusive OR) [instruction]." *Id.* at 16:28-35 (emphasis added). Likewise, for Galois-field multiplication, the Patents-in-Suit disclose using Intel's SIMD instructions to perform "GF multiplication … on multiple bytes at a time": "Multiply-by-2 in GF arithmetic can be implemented across 64 bytes at a time in 4 XMM registers via 4 consecutive PXOR instructions, 4 consecutive PCMPGTB (Packed Compare for Greater Than) instructions, 4 consecutive PADDB (Packed Add) instructions, 4 consecutive PAND (Bitwise AND) instructions, and 4 consecutive PXOR instructions. Though this takes 20 machine instructions, the instructions are very fast and results in 64 consecutive bytes of data at a time being multiplied by 2." *Id.* at 17:43-51 (emphasis added). The Asserted Patents further recite that "it is still possible to improve on this by building

5

a parallel multiplier with a table lookup (Parallel Lookup Multiplier) using the PSHUFB (Packed Shuffle Bytes) instruction and doing the GF multiplication in 4-bit nibbles (half bytes)." *Id.* at 17:57-61.

All of these SIMD instructions referenced by the Asserted Patents, however, including for example the PSHUFB instruction, were written by Intel for its modern x86 processors that were "**readily available and inexpensive**" when the patents were filed. *Id.* at 27:5-23 (emphasis added); Ex. 1 [Long Report] at ¶¶64-65, 79; Ex. 8 [Deposition of Thomas Conte, March 24, 2023] at 107:9-108:4, 140:1-9.

The Patents-in-Suit also disclose that the multiplication of matrix entries can be accessed in two sequences or orders of operations: (i) "column-by-column," *i.e.*, parallelizing the multiplication operations involved in matrix multiplication by columns of the data matrices holding the original data; and (ii) "row-by-row," *i.e.*, parallelizing the multiplication operations by rows of the data matrices. Ex. 2 [8'296 Patent] at 19:18-38. Each sequence produces the same results as mandated by the basic principles of linear algebra. *Id.* at 19:47-48. The claims recite these orders of operations as a "sequencer" for "ordering operations through the data matrix and the encoding matrix using the parallel multiplier." *Id.*, Claim 1. The specification further describes that the claimed sequencer processes calls to the parallel multiplier to different processing cores, divides data matrices, and assigns them to different data drives. *Id.* at 19:59-22:44.

Finally, according to the Patents-in-Suit, the parallelization and sequencing can be organized into multiple processing threads according to known programming techniques. *Id.* at 24:5-13 ("on a Linux system, software may be organized into 'threads,' and threads may be assigned to specific CPUs and memory systems via the kthread_bind function when the thread is created.  Creating separate threads to process the GF arithmetic allows parallel computations to

take place, which multiplies the performance of the system."). The use of multiple threads in computer processing was conventional long before the Asserted Patents were filed. *Id.*; s*ee also* Ex. 1 [Long Rep.] at ¶¶84-85, 763, Ex. 8 [Conte Tr.] at 147:20-148:6.

      **C.**     **The Asserted Claims.**

Claim 1 of the 8'296 Patent is representative of the other asserted independent claims (Claim 34 of the 8'296 Patent, Claim 1 of the '374 Patent, Claim 1 of the '759 Patent, Claim 12 of the '259 Patent, Claims 1 and 5 of the 10'296 Patent, which, as shown below, are directed to similar systems performing the same encoding/decoding mathematical operations on the same generic architecture, with only minor differences).[2] Claim 1 is fully reproduced below:

    1. A system for accelerated error-correcting code (ECC) processing comprising:

        a processing core for executing computer instructions and accessing data from a main memory; and

        a non-volatile storage medium for storing the computer instructions,

        wherein the processing core, the non-volatile storage medium, and the computer instructions are configured to implement an erasure coding system comprising:

        a data matrix for holding original data in the main memory;

        a check matrix for holding check data in the main memory;

        an encoding matrix for holding first factors in the main memory, the first factors being for encoding the original data into the check data; and

        a thread for executing on the processing core and comprising:

            a parallel multiplier for concurrently multiplying multiple data entries of a matrix by a single factor; and

            a first sequencer for ordering operations through the data matrix and the encoding matrix using the parallel multiplier to generate the check data.

---

[2] Representative claims may be used in analyzing subject matter eligibility where all of the claims are "substantially similar and linked to the same abstract idea," particularly where the "claims contain substantially similar wording." *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1348 (Fed. Cir. 2014) (internal citation omitted).

Ex. 2 [8'296 Pat.] at 28:9-33. As shown by the color-coding above, the claim is directed to a system for encoding original data into check data using parallel mathematical operations:

- The green-highlighted limitations disclose an "erasure coding system" comprised of generic computer components ("processing core," "non-volatile storage medium") and computer instructions;

- The blue-highlighted limitations disclose the basic concepts of erasure coding, namely, the use of matrices for encoding (using an encoding matrix) original data (stored in a data matrix) into check data (stored in a check matrix);

- The purple-highlighted limitations call for a thread (a computer instruction) so that the computer processor performs the matrix math concurrently in a given order "to generate the check data."

In sum, the claim recites a system that encodes original data to check data using erasure coding in which the mathematical operations involved are performed concurrently in a certain sequence/order. The claim itself does not specify any particular way of performing the parallel multiplication or sequencing.

The computer-related elements of the Patents-in-Suit, such as a "processing core" and "non-volatile storage medium," are generic and conventional components, as the inventor concedes. Ex. 9 [Deposition of Michael Anderson, September 7, 2022] at 165:25-166:5 ███████

████████████████████████████████████████████████

████████████████ (counsel objection omitted). In addition, the claim recites a "data matrix," "check matrix," "encoding matrix," "thread," "parallel multiplier," and "first sequencer" that are defined only by their functions: a "data matrix" for holding original data, a "check matrix" for holding check data, an "encoding matrix" for holding factors for encoding the original data into

8

the check data, a "thread" for executing the tasks, a "parallel multiplier" for concurrently multiplying data entries, and a "first sequencer" for ordering operations. These limitations are nothing more than generic architecture and software modules for mathematically representing and encoding data.

The other asserted independent claim of the 8'296 Patent (Claim 34) is nearly identical and recites a "non-transitory computer-readable storage medium containing a computer program" that performs the same parallelized encoding process on the same generic, conventional architecture.

The asserted independent claims of the later-filed Patents-in-Suit (Claim 1 of the '374 Patent, Claim 1 of the '759 Patent, and Claim 1 of the 10'296 Patent) recite some additional details regarding the "parallel multiplier," "sequencer," number and type of "processor cores," and number of data and check drives, but they similarly describe conventional computer architecture. For example, Claim 12 of the '259 Patent recites a "processor" that has "at least one single-instruction-multiple-data (SIMD) central processing unit (CPU) core that executes SIMD instructions," which was admittedly conventional at the time the patents were filed. Ex. 6 [Anderson Tr.] at 446:23-447:1 ███████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████; Ex. 1 [Long Report] at ¶64; Ex. 8 [Conte Tr.] at 140:1-6. As with Claim 1 of the 8'296 Patent, all of the recited architecture and concepts are used in their well-understood manner to perform the same encoding process in which mathematical operations are performed in parallel.

StreamScale also asserts certain dependent claims, which add limitations that essentially repeat the same functions recited in the independent claims. None of the asserted dependent claims meaningfully adds to or limits the independent claims from which they depend.

9

## III.    LEGAL STANDARDS

### A.    Summary Judgment.

Summary judgment is appropriate when, drawing all justifiable inferences in the nonmovant's favor, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The court must afford all reasonable inferences and construe the evidence in the light most favorable to the non-moving party. See *id.* at 255. A "complete failure of proof concerning an essential element of the nonmoving party's case" renders summary judgment proper in favor of the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

### B.    Patent Ineligibility Under 35 U.S.C. § 101.

35 U.S.C. § 101 provides that "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor." Section 101 implicitly excludes from patentability "[l]aws of nature, natural phenomena, and abstract ideas." *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 70 (2012). Patent eligibility has "in many cases" been resolved on summary judgment. *Berkheimer v. HP, Inc*., 881 F.3d 1360, 1365 (Fed. Cir. 2018).

Assessing subject matter eligibility follows a two-step analysis. *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 218 (2014). The first step is to "determine whether the claims at issue are directed to … patent-ineligible concepts." *Id.* If the claims are directed to a patent-ineligible concept, the second step is to determine whether the claim limitations, analyzed individually and as ordered combinations, contain an inventive concept that is "significantly more" than the abstract idea, thus transforming the claims into patent-eligible subject matter. *Id.*

IV.    **ARGUMENT**

A.    *Alice* **Step One: StreamScale's Patent Claims Are Directed To The Abstract Idea Of Using Math To Encode / Decode Data.**

The Asserted Claims as a whole are directed to the concept of erasure coding, and thus to an abstract idea. In particular, the Asserted Claims recite a system that uses Galois-field matrix math to encode/decode data from one form to another (encoding from original data to check data; decoding from check data to original data). But this math can be performed by humans solely in the mind, or with pen and paper. This is the telltale sign of an abstract idea. *See, e.g.*, *Health Discovery Corp. v. Intel Corp.*, 577 F. Supp. 3d 570, 585 (W.D. Tex. 2021) (Albright, J.) ("a mathematical idea can be novel and even a groundbreaking advance and still not be patent eligible") (internal citation and quotation marks omitted); *Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*, 955 F.3d 1317, 1327 (Fed. Cir. 2020) ("We have repeatedly found unpatentable" "the sort of process that can be performed in the human mind, or by a human using a pen and paper") (citation and internal quotation marks omitted); *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016) ("we have treated analyzing information by steps people go through in their minds, or by mathematical algorithms, without more, as essentially mental processes within the abstract-idea category").

That the Patents-in-Suit claim this abstract concept of erasure coding in the computer setting in order to be performed faster—or to "accelerate" the mathematical computations, in the terminology used in the Patents-in-Suit—does not make the claimed invention any less abstract. As this Court has held previously, patent claims that simply "recite the use of a computer to do what humans … have done for years" are not patentable. *See Broadband iTV, Inc. v. Amazon.com, Inc.*, No. 6:20-CV-00921-ADA, 2022 WL 4703425 (W.D. Tex. Sept. 30, 2022) (Albright, J.) (emphasis added); *see also*, *e.g.*, *RecogniCorp, LLC v. Nintendo Co., Ltd*., 855 F.3d 1322, 1326

11

(April 28, 2017) ("generalized steps [for encoding and decoding information] to be performed on a computer using conventional computer activity" were abstract); *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1315 (Fed Cir. 2016) ("Claims that amount to nothing significantly more than an instruction to apply [an] abstract idea … using some unspecified, generic computer and in which each step does no more than require a generic computer to perform generic computer functions do not make an abstract idea patent-eligible.") (internal quotation marks omitted).

Further evidence that the Asserted Claims are directed to an abstract idea is that they fail to recite any improvement to a technological process. *See Athena Diagnostics, Inc. v. Mayo Collaborative Servs., LLC*, 915 F.3d 743, 750 (Fed. Cir. 2019) ("To determine whether a claim is directed to an ineligible concept, we have frequently considered whether the claimed advance improves upon a technological process or merely an ineligible concept, based on both the written description and the claims."). Instead, the purported "improvement" here is simply the use of modern computers' ability to process tasks simultaneously, in parallel, rather than serially, which allows for faster computation. *See, e.g.,* Ex. 2 [8'296 Pat.] at 3:33-37 (the claimed invention is "directed toward efficient implementations that can maximize or significantly leverage <u>the available parallel processing power of multiple cores</u> working concurrently on the check data generation and lost data reconstruction"); Ex. 9 [Deposition of Michael Anderson, September 7, 2022] at 190:18-191:3 ███████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████████████████

This is itself, of course, an abstract idea. The notion of doing multiple tasks at once in order to speed up a process is ancient, and dates to the very beginnings of human organization. Courts have routinely found that patents claims that recite parallel processing, including coordination to break up tasks across multiple computers and perform tasks in parallel, are directed to abstract ideas and are patent-ineligible. *See, e.g.*, *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1165, 1167-68 (Fed. Cir. 2018) (ineligible claims with "'parallel processing' computing architecture"); *Teradata US, Inc. v. SAP SE*, No. 20-cv-06127-WHO, 27 2021 WL 6332792, at *9 (N.D. Cal. Oct. 5, 2021) (ineligible claims for improved efficiency of "distributed" "parallel execution of database tasks"); *Swarm Tech LLC v. Amazon.com Inc.*, No. CV-21-00438-PHX-DJH, 2021 WL4263728, at *1-3 (D. Ariz. Sept. 20, 2021) (ineligible "multiprocessor system with the speed of parallel processing"); *Uniloc 2017 LLC v. Netflix, Inc.*, No. 18-2055-GW, 2019 WL 3291581, at *5 (C.D. Cal. May 14, 2019) (using computers to process tasks "concurrently rather than serially . . . is an abstract concept"); *Appishy, Inc. v. Amazon.com Inc.*, 26 No. C15-311 MJP, 2015 WL 4210890, at *2 (W.D. Wash. July 9, 2015), *aff'd sub nom. Appistry, LLC v. Amazon.com, Inc.*, 676 F. App'x 1007 (Fed. Cir. 2017) (ineligible claims for "process[ing] information and/or complet[ing] a task by breaking down the job into small pieces, each handled by a different actor").

The Asserted Claims here do not alter the conventional functioning of any computer system in any way—having two computer processors do mathematical calculations in parallel and then combining the results will of course make the calculations go faster, no differently than having two people performing mathematical calculations with pen and paper at the same time and combining the results would. Yes, the results are achieved faster, but that does not change the fact that what is being claimed in the end is simply the performance of mathematical calculations. "The different use of a mathematical calculation, even one that yields different or better results, does

13

not render patent eligible subject matter." *In re Bd. of Trustees of Leland Stanford Junior Univ.*, 991 F.3d 1245, 1251 (Fed. Cir. 2021) (affirming § 101 rejection of claims that were "drawn to abstract mathematical calculations and statistical modeling," rejecting "that the alleged increase in haplotype prediction accuracy renders claim 1 a practical application rather than an abstract idea," finding that the alleged inventive concept was directed to "the mathematical analysis itself," and "does not qualify as an improvement to a technological process."); *Parker v. Flook*, 437 U.S. 584, 595 n.18 (1978) ("Very simply, our holding today is that a claim for an improved method of calculation, even when tied to a specific end use, is unpatentable subject matter under § 101."); *Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*, 758 F.3d 1344, 1350–51 (Fed. Cir. 2014) (claims for "organizing information through mathematical correlations" and "a process that employs mathematical algorithms to manipulate existing information to generate additional information" were directed to an abstract idea); *In re Schrader*, 22 F.3d 290, 293 (Fed. Cir. 1994) (holding that "a mathematical algorithm is implicit" in a claim that applied mathematical optimization procedures, rendering the claim ineligible under section 101).

The Asserted Claims are directed to an abstract idea for the additional reason that they are described in functional terms with insufficient explanation on how to achieve the desired result. The claims describe nothing more than the generic concepts of erasure coding (encoding original data to check data, decoding check data to original data) and parallel processing (dividing and assigning math operations to different computers and computing in parallel). But the claims contain no description on how the encoding, decoding, dividing, assigning and computing steps are performed. In other words, they recite "processing core," "storage medium," "computer instructions," "data matrix," "check matrix," "encoding matrix," "parallel multiplier," "sequencer," for example, merely as generic tools to carry out their functions, without any

14

particular way of performing the functions. The claims disclose no details regarding how the matrices are encoded/decoded or how the matrices and mathematical operations are divided and ordered. This is another classic hallmark of abstractness under the *Alice* test. *See, e.g.*, *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1337 (Fed. Cir. 2017) ("Claim 1 recites a method for routing information using result-based functional language ... but does not sufficiently describe how to achieve these results in a non-abstract way."); *Affinity Labs of Texas, LLC v. Amazon.com Inc.*, 838 F.3d 1266, 1269 (Fed. Cir. 2016) ("The purely functional nature of the claim confirms that it is directed to an abstract idea, not to a concrete embodiment of that idea."). In fact, the claims fail to recite any specific "processing" technique at all and are therefore abstract. *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1348 (Fed. Cir. 2015) (where a claim "contains no restrictions on how the result is accomplished," but rather is directed to the abstract idea itself, the claim is not directed to patent-eligible subject matter).

Accordingly, the Asserted Claims fail the first step of the *Alice* test, and are directed to an abstract idea.

**B.    *Alice* Step Two: The Asserted Claims Lack an Inventive Concept.**

Because the claims are directed to an abstract idea, the Court must next determine whether they contain an "inventive concept, i.e., an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 217-18 (2014) (quoting *Mayo Collaborative Services v. Prometheus Laboratories Inc.*, 566 U.S. 66, 72-73 (2012)). "To save a patent at step two, an inventive concept must be evident in the claims." *RecogniCorp, LLC v. Nintendo Co.*, *Ltd.*, 855 F.3d 1322, 1327 (Fed. Cir. 2017). Applying "an abstract idea using conventional and well-understood techniques" does not transform it to a patent eligible application

15

of an abstract idea. *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1290-91 (Fed. Cir. 2018).

As an initial matter, the Asserted Claims are themselves abstract. To wit, Claim 1 of the 8'296 Patent recites "a [data/check] matrix for holding [original/check] data," "an encoding matrix for … encoding the original data into the check data," "a parallel multiplier for concurrently multiplying multiple data entries of a matrix by a single factor," and "a first sequencer for ordering operations" "to generate the check data." Thus, the court need not consider whether they make use of "well-understood, routine and conventional" technology. *Id.* at 1290.

But in any case, the Asserted Claims admittedly do exactly that. As demonstrated above, the common specification admits that erasure coding, as a "related art" known for decades, used matrix math to encode data into check data before the patents. Ex. 2 [8'296 Pat.] at 1:14-51. The named inventor admits this. Ex. 3 [Anderson Tr.] at 105:20-22. And the Asserted Claims purport to "accelerate" the performance of erasure coding using the conventional computer technology available at the time. As the Patents-in-Suit recite, the claimed invention merely "leverage[s] the <u>available</u> parallel processing power of multiple cores working concurrently on the check data," specifically, by utilizing computer instructions written by Intel for its x86 processors that were "**<u>readily available and inexpensive</u>**" at the time. Ex. 2 [8'296 Patent] at 3:33-37, 27:5-23 (emphasis added). The Patents-in-Suit specifically note that the invention makes use of "**<u>commodity components</u>** that are leveraged to achieve the result." *Id.* at 23:63-65 (emphasis added).

There is nothing "inventive" about using conventional computing technology—e.g., multiple core computer processors—in a well-understood way to do mathematical calculations in parallel. *See Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1355 (Fed. Cir. 2016) ("We have repeatedly held that such invocations of computers" "readily available" "are not even arguably inventive" and "are insufficient to pass the test of an inventive concept in the application

of an abstract idea") (internal quotation marks and citations omitted); *SAP Am.*, 898 F.3d at 1170 ("we think it fair to say that an invocation of already-available computers that are not themselves plausibly asserted to be an advance, for use in carrying out improved mathematical calculations, amounts to a recitation of what is well-understood, routine, and conventional.") (internal quotation marks and citations omitted).

Furthermore, the purely functional language cannot, as a matter of law, provide an inventive concept. *See USC IP P'ship, L.P. v. Facebook, Inc.*, 576 F. Supp. 3d 446, 455-56 (W.D. Tex. 2021) (Albright, J.) (holding claims "only recite high-level functional language without explaining how the claimed invention improve the functionality of the computer or the internet" unpatentable). In particular, to survive at step two, the <u>claims</u> (and not the specification) must recite the purported inventive concept. *RecogniCorp*, 855 F.3d at 1327. Here, however, the claim language evinces that the claimed "parallel multiplier," "sequencer," "processing core," "non-volatile storage medium," "computer instructions," "data matrix," "check matrix," "encoding matrix" are not defined by how they alter or affect any computer functionality or achieve the claimed improvement, but by their general purposes. The claim language lacks the "specificity" to provide an inventive concept. *See USC IP P'ship,* 576 F. Supp. 3d at 455-56; *Elec. Power Grp.*, 830 F.3d at 1355 (claims ineligible without "requirements for how the desired result is achieved" but "merely call for performance of the claimed … functions").

The same is true for the rest of the Asserted Claim, which recite the same abstract idea. None of the additional limitations set forth below supply the necessary inventive concept:

- **The claimed "sequencer" "access[ing] each entry of the data matrix … at most once" in the encoding process (8'296 Patent, Claims 2, 35; '759 Patent, Claim 7); the claimed "sequencer" "load[ing] each entry of the surviving original data … at most once" in the decoding process ('259 Patent, Claim 14)**. These limitations just recite the basic math of matrix multiplication, in which each entry of the relevant matrix is accessed once. A "specific computational step[] … is insufficient to establish patent

17

eligibility." *In re Bd. of Trustees of Leland Stanford Junior Univ.*, 991 F.3d at 1249.

- **The steps of "dividing the original data … into a plurality of data matrices," "dividing the check data … into a plurality of check matrices," "assigning corresponding ones of the data matrices and the check matrices … to the plurality of threads," and "assigning the [] threads to the processing cores / CPU cores" (8'296 Patent, Claims 3, 36; 10'296 Patent, Claim 1)**. These steps of dividing and assigning tasks across computers for parallel processing, as discussed above, are abstract as a matter of law, and thus cannot take the claims outside the realm of an abstract idea. "It has been clear since *Alice* that a claimed invention's use of the ineligible concept to which it is directed cannot supply the inventive concept that renders the invention 'significantly more' than that ineligible concept." *BSG Tech*, 899 F.3d at 1290. In addition, six dependent claims of the 10'296 Patent also recite these steps with similar wording, and likewise cannot render the claims any less abstract:

  o **"divid[ing] the original data … and the check data … into a plurality of stripes, each … comprising at least: one block of the original data; and one corresponding block of the check data"** (10'296 Patent, Claims 2, 6).

  o **"assign[ing] the stripes to the plurality of stripes to the plurality of threads such that, for each stripe of the plurality of stripes, [] the check data of the stripe [] is computed by no more than one of the plurality of threads"** (10'296 Patent, Claims 3, 7).

  o **"the plurality of threads corresponding to at least one of the plurality of stripes is assigned to a respective one of the plurality of CPU cores"** (10'296 Patent, Claims 4, 8).

- **"the data matrix comprises a first number of rows; the check matrix comprises a second number of rows; and the encoding matrix comprises the second number of rows and the first number of columns" (8'296 Patent, Claim 4)**. It is basic math that, for matrix multiplication, the number of columns in the first matrix (encoding matrix) must be equal to the number of rows in the second matrix (data matrix), and the resulting matrix (check matrix) has the number of rows of the first (encoding matrix) and the number of columns of the second matrix (data matrix). *See, e.g.*, Ex. 2 [8'296 Pat.] at 11:6-12:67 (showing the process of matrix multiplication as a M×N matrix (a matrix with M rows and N columns) multiplied with a N×L matrix, resulting in a M×L matrix); Ex. 10 [Strang, *Introduction to Linear Algebra*, Fourth Edition (2009)] at 67 ("Suppose A is m by n and B is n by p. We can multiply. The product AB is m by p."). This limitation merely restates a basic math principle and cannot supply any inventive concept.

- **"the processing core comprising at least 16 data registers, each of the data registers comprising at least 16 bytes" ('374 Patent, Claim 1; '759 Patent, Claim 1)**. Again, this limitation describes admittedly well-understood, routine and conventional hardware that, as a matter of law, is insufficient to supply an inventive concept. *Elec. Power Grp.*, 830 F.3d at 1355; *SAP Am.*, 898 F.3d at 1170. The patent

4893-1283-3394

specification itself states that Intel's x86 architecture, which was admittedly "readily available and inexpensive" at the time of filing, "supports 16 XMM registers," "[e]ach [of which] holds 16 bytes." Ex. 2 [8'296 Pat.] at 27:5-12.

- **"an input/output (I/O) controller for controlling data transfers / that receives [data]" ('759 Patent, Claim 1; '259 Patent, Claim 12; 10'296 Patent, Claim 1)**. Again, this limitation describes admittedly well-understood, routine and conventional hardware. The named inventor admits that the use of I/O controller to transfer data was known before the patents. Ex. 6 [Anderson Tr.] at 445:2-6. As a matter of law, this limitation cannot supply an inventive concept. *Elec. Power Grp.*, 830 F.3d at 1355; *SAP Am.*, 898 F.3d at 1170.

- **"the parallel multiplier comprises two lookup tables for doing concurrent multiplication of 4-bit quantities across 16 byte-sized entries using the PSHUFB (Packed Shuffle Bytes) or equivalent instruction" ('374 Patent, Claim 5; '759 Patent, Claim 5)**. StreamScale's technical expert admits that this limitation describes merely well-understood, routine and conventional use of the PSHUFB instruction. Ex. 8 [Conte Tr.] at 144:3-7 ███████████████████████████████ ██████████████████████████████████████████. Therefore, it cannot supply an inventive concept as a matter of law. *Elec. Power Grp.*, 830 F.3d at 1355; *SAP Am.*, 898 F.3d at 1170.

- **"the parallel multiplier is further configured to: receive an input operand in at least one of the data registers; and return with the input operand intact in the at least one of the data registers" ('374 Patent, Claim 6; '759 Patent, Claim 6)**. This limitation describes a simple computational step and cannot supply an inventive concept. *BSG Tech*, 899 F.3d at 1290.

- **"each of the CPU cores comprising at least 16 registers, and each of the registers storing at least 8 bytes" (10'296 Patent, Claim 1)**. This limitation describes admittedly well-understood, routine and conventional hardware that, as a matter of law, cannot supply an inventive concept. *Elec. Power Grp.*, 830 F.3d at 1355; *SAP Am.*, 898 F.3d at 1170. As noted, the patent specification states that Intel's x86 architecture, which was admittedly "readily available and inexpensive" at the time of filing, "supports 16 XMM registers," "[e]ach [of which] holds 16 bytes," Ex. 2 [8'296 Patent] at 27:5-12.

- **"a Galois Field (GF) multiplier, a Galois Field (GF) adder … to generate/decode the check data" (10'296 Patent, Claims 1, 5)**. The use of Galois-field math, including a GF multiplier and GF adder, in erasure coding to generate check data was known for decades before the Asserted Patents. *See, e.g.*, Ex. 6 [Anderson Tr.] at 446:23-447:1, 455:3-6. Well known math cannot take the claims out of the realm of an abstract idea.

- **A "single-instruction-multiple-data (SIMD) central processing unit (CPU) core that executes SIMD instructions … the SIMD CPU core comprising at least 16 vector registers, each of the vector registers storing at least 16 bytes" ('259 Patent,**

**Claim 12**). As discussed above, the named inventor acknowledges that this limitation merely describes ███████████████████████████ (Ex. 6 [Anderson Tr.] at 446:23-447:1, 450:23-451:2), and thus cannot supply an inventive concept. *BSG Tech*, 899 F.3d at 1290.

- **The steps of "assigning the data operations to [a] first thread group … assigning the I/O operations to [a] second thread group … assigning the first thread group to the first CPU core; assigning the second thread group to the second CPU core; and concurrently executing the first thread group on the first CPU core and the second thread group on the second CPU core to concurrently regenerate the lost original data and perform the I/O operations" ('259 Patent, Claim 13)**. This limitation likewise describes the abstract idea of breaking up two decoding tasks and concurrently performing each. An abstract idea cannot itself supply an inventive concept. *BSG Tech*, 899 F.3d at 1290.

- **"at least one parallel multiplier multiples the at least one vector of the surviving data matrix in units of at least 64 bytes" ('259 Patent, Claim 15)**. This limitation merely describes performing a multiplication operation and cannot supply an inventive concept. *In re Bd. of Trustees of Leland Stanford Junior Univ.*, 991 F.3d at 1249.

- **The claimed processor being "an x86 architecture processor" ('259 Patent, Claim 16)**. As the common specification provides, "x86 architecture processors" were "readily available and inexpensive" when the patents were filed (Ex. 2 [8'296 Pat.] at 27:5-23), and thus cannot add any inventive concept. *Elec. Power Grp.*, 830 F.3d at 1355; *SAP Am.*, 898 F.3d at 1170.

- **The claimed "parallel multiplier multiplies … the surviving data matrix … at a rate of less than about 2 machine instructions per byte of the surviving data matrix" ('259 Patent, Claim 19)**. This limitation merely describes the rate of the well-known x86 architecture (Ex. 1 [Long Rep.] ¶431) and thus cannot provide an inventive concept. *Elec. Power Grp.*, 830 F.3d at 1355; *SAP Am.*, 898 F.3d at 1170.

The claim elements here are merely directed to a conventional multi-threading computer architecture to perform erasure coding as it was intended to be used. They do not reveal a "non-conventional and non-generic arrangement of known, conventional pieces" that might provide an inventive concept. *Bascom Global Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016). Accordingly, the Asserted Claims are all unpatentable under Section 101.

## V.     CONCLUSION

For the foregoing reasons, the Court should grant Cloudera's Motion for Summary Judgment of Invalidity.

Dated: July 28, 2023

Respectfully submitted,

By:    */s/ Christopher Kao*
Christopher Kao (*admitted*)
   christopher.kao@pillsburylaw.com
Brock S. Weber (*admitted*)
   brock.weber@pillsburylaw.com
**Pillsbury Winthrop Shaw Pittman LLP**
4 Embarcadero Center, 22nd Floor
San Francisco, CA  94111
Telephone: 415.983.1000 / Facsimile:  415.983.1200

Steven P. Tepera (TX Bar No. 24053510)
   Steven.tepera@pillsburylaw.com
Benjamin L. Bernell (TX Bar No. 24059451)
   ben.bernell@pillsburylaw.com
**Pillsbury Winthrop Shaw Pittman LLP**
401 Congress Avenue, Suite 1700
Austin, TX  78701-3797
Telephone: 512.580.9600 / Facsimile: 512.580.9601

Audrey Lo (*pro hac vice*)
   audrey.lo@pillsburylaw.com
**Pillsbury Winthrop Shaw Pittman LLP**
2550 Hanover Street
Palo Alto, CA  94304
Telephone: 650.233.4500

*Counsel for Defendant Cloudera, Inc.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing

document has been served on all counsel of record via electronic mail on July 28, 2023.

*/s/ Christopher Kao*

4893-1283-3394